will now move to the next argument on the calendar. That is McCrae v. Capital. Mr. Edelstein, are you on the line? I am, your honor. May I proceed? You can see and hear? No, not yet. I've got to make sure that Ms. Stewart is on the line. What? Hold on one second. Okay. And great. All right. And are you able to see and hear the panel or me? All right. Yes, your honor. I can see you. All right. So, Mr. Edelstein, you've reserved three minutes for rebuttal. So, yes, your honor. Thank you. Good morning, your honors. May it please the court. My name is Jonathan Edelstein. I represent the petitioner appellant, Terrence McCrae. At his trial, Mr. McCrae received the so-called sample of the complainant's psychiatric records, which contained only 28 out of more than 5,500 pages and did not contain the records that actually mattered for the purposes of the trial. What was disclosed was that the complainant suffered from mood disorders and sensed the presence of her dead grandfather, but not that she had a poor grip on reality and that she would fantasize, confabulate, and lie. Now, the state courts, and in the very words of the state courts that decided this appeal, this was a he said, she said case, in the words of the court of appeals, in which, in the words of the So, this was not an open and shut case. This was a close case. The state courts acknowledged it to be that, and under those circumstances, the failure to disclose the full psychiatric record was a violation of Brady versus Maryland, Pennsylvania versus Ritchie and their progeny, and it was unreasonable for the state courts to find otherwise. The state courts systematically undervalued the withheld materials and was essentially looked at them in the light most favorable to the prosecution. That's an appropriate outlook for a sufficiency challenge, but not for a Brady challenge. The standard under Brady is whether there's a reasonable probability of a different outcome, and what the Supreme Court teaches us in Kyle's and in other cases is that the reasonable probability is not a sufficiency test, and it's not a preponderance test. A reasonable probability can be less than half, and moreover, in cases such as Aggers and more recently Weary versus Kane, the Supreme Court has told us that where a case hinges on the whether the jury believes the complainant, which was certainly true here, that even in the words of the Aggers court, even evidence of minor significance is enough to clear the Brady threshold and to establish a reasonable probability of a different outcome. Can we go back to the procedure that was used in which the trial judge reviews 5,000 pages and turns over a sample is it your position that the error here, the deficiency here was that the sample was insufficient and instead of 28 pages, it should have been maybe 30 or 80 pages, or is it your position that the judge was obliged under Brady to produce all Brady material and to omit turning over only those parts of the complainant's mental health file that did not have bearing upon the case? Well, your honor, I would submit under Ritchie and its progeny that the state court did have an obligation to withhold only those parts that did not bear on the case, and that the defendant was entitled to the disclosure of those records that did bear on the case, and particularly those that dealt with the complainant's truthfulness and her ability to perceive, recall, and recount. Even if that would result in duplicative or cumulative production of documents and all the judge did is remove things that dealt with, say, I don't know, an eating disorder or something that did not have bearing on the case? Well, I think that it should be up to the defense counsel to determine what's duplicative and what's not. I mean, often something that's seemingly duplicative, in fact, adds something to the other records. And in fact, sometimes even the fact that a condition is repeated over a period of time adds something, even though there are records over that time reveal the same condition. But in further answer to your question, Judge, I would say that if it was permissible for the trial judge to turn over a sample, which we would submit that it was not, it at least should have been a representative sample. It should have been a sample that disclosed all of the conditions with which the complainant had been diagnosed, not just the mood disorders, not just seeing her grandfather, but all of the conditions relating to her grasp on reality, her confabulation, her selective memory, fantasizing, and truthfulness. Mr. Elstein, can I ask a question? I think we're having a bit of a feedback problem, but I'll try to, I don't know if it's happening on my end or yours, but the question I was going to ask, whatever the trial court should have done, and I'm inclined to the view that the trial court should have turned over anything that had an exculpatory bearing on the case. I'm not sure what the judge meant by a sample, frankly, a sampling of the total record or a sampling of the things that might be exculpatory. But focusing on what the appellate courts in New York did, it was my impression that what they were doing was reviewing this record to see whether what the district, if there's anything that the trial court failed to turn over that would have had a, created a reasonable probability of a different verdict. Maybe they did that badly or wrongly, but is that your understanding of the standard that was applied by the, well, let's just say the New York Court of Appeals as the final word on this? Well, the Court of Appeals did analyze the disclosure under Brady and therefore, yes, it was ostensibly applying a reasonable probability standard. So you're saying they applied that unreasonably? Unreasonably. Yes, judge, by not paying heed to such cases as Aggers and to Weary v. Cain, which elucidate what a reasonable probability means in a close case, and particularly in a one witness case, such as with Weary was, and where the Supreme Court in Weary held that even though that witness was impeached in other ways, the fact that this new, more powerful impeachment was available was sufficient to overcome the Brady threshold. And in Aggers, the Supreme Court specifically said in a close case, even evidence of minor significance clears the Brady threshold. And the state court certainly did not pay heed to that in their reasonable probability analysis. They were instead systematically minimizing the significance of what was withheld, drawing inferences in the prosecution's favor as to what a jury would have thought of that and done with that. Whereas what they should really be looking at is in a close case, could the jury have made a determination that if the complainant lied once, she was lying again? Could the jury have determined that if she was misunderstanding the event with her father, she was also misunderstanding this? One other question. What, if any, significance should we give to the fact that the district court identified a document that the New York appellate courts had not considered, that the district court thought was worthy of consideration? And or what significance do you think we should give if any of us discover in the 5,500 pages yet another document that was not explicitly considered by the New York appellate courts? Does that matter? Do we then argue, do we look at the significance of that particular document or how should we deal with that kind of situation? Well, what I would submit, first of all, is that any document that was not reviewed and analyzed by the state courts, the significance of it was not determined on the merits and therefore this court's review of it should be de novo. But if this court declines to adopt that, then I would submit that the fact that the state appellate courts missed pertinent documents is further evidence that their review was not reasonable and that their application of Brady was not reasonable. Because certainly a reasonable application of Brady and its progeny and of Ritchie and its progeny would require them to review and find and analyze all of the documents that bear on the case, on the complainant's truthfulness, on her ability to perceive, recall, and recount. Now there is a document that recounts her memory or claim that her father pushed her up against a wall and attempted a sexual assault. What is the history of that document? When was it produced? How does anybody know about it? Well, the document was produced when the complainant, I believe, was 13, approximately five years before this incident. What was the history of the production of that document in this case so that you could see it and the courts could see it? Your Honor, we have never seen it. The petitioner and his attorneys have never seen it. It was produced and reviewed in camera and then it was analyzed in the appellate decisions in the state courts which described it. But I have never seen this actual document and neither has anybody else associated with the petitioner. Thank you. All right. You've reserved three minutes of rebuttal, Mr. Edelstein. We'll now hear from Ms. Stewart. Ms. Stewart, just unmute yourself. There you go. Good morning, Your Honors. Priscilla Stewart from the New York State Attorney General's Office appearing on behalf of the respondent, Michael Capra, in this matter. This court should affirm the decision of the district court denying the petition for a writ corpus. The state court correctly applied Supreme Court law and analyzed petitioner's claim as implicating his due process rights. And in doing so, the court reasonably held that the undisclosed documents were not material because there was not a reasonable probability that their disclosure would affect the outcome of the trial. In this particular case, Your Honor, the state court did not apply the reasonable probability standard set forth under the federal standard under Brady. Instead, the court applied the more lenient standard of a reasonable possibility found in the New York State Constitution. So the court applied a more lenient materiality standard in reaching its conclusion. The court also reasonably concluded that the mental health records that had been disclosed to the defense provided an ample basis to investigate how the victim's illnesses affected her behavior and for the defense to be able to impeach her trial testimony. The defense learned not only about the victim's medical diagnoses and the information about her prescribed medications, the defense also received information about how her conditions affected her behavior. And the court of appeal... I'm sorry, counsel, would that include memory problems? The disclosed information informed the defense that she suffered... I apologize, I'm having problems here. We all are. Okay, I'll get back to you. I hear you. The disclosed information informed the defense that she suffered from epilepsy and that provides the defense an opportunity to learn that those who suffer from epileptic seizures often suffer from memory loss. But even in addition to that, the defense was informed that there was at least one incident where the victim was found wandering the highway and couldn't remember how she got there. That information was produced to the defense and the defense did attempt to question the victim about it. So that is information that the defense did have to know that her illnesses had effects on her memory. Would you concede that there's a difference between saying that somebody has a certain condition which can in some instances or maybe even most impair memory and evidence that this particular complainant or witness actually experienced memory problems? Yes. And the disclosure that she was found wandering the highway without remembering how she got there does tell the defense that she is having problems with her memory. But in addition to that, Your Honor, the Court of Appeals was clear that it didn't believe that this case turned on issues of memory. This was a case where the victim, once she got away from the petitioner, immediately made an outcry of the sexual attack. She ran outside crying and bleeding, sought help from people on the street. She was directed to a pay phone. She immediately called 911. But there's also a document that says that that is a characteristic of her memory that when something bad happens, when somebody does something to her that she resents, she tends to forget the good part of their relationship, which in this case could mean that there was a pleasurable part of the encounter, which was voluntary, and that it would turn bad. She no longer remembered that. Well, Your Honor, first, she was able to remember most aspects of the date. Well, all the other aspects of the date. She was able to recount all the people that she met that day, the places that they went. She was able to recount that she did have consensual kissing and fondling with the petitioner during the course of that date. The only thing that they are divergent on is the actual sex act itself. According to the petitioner, the violence happened immediately after the sex because they were struggling over her trying to according to her, the fight happened prior to the sex. The fight was the lead into the sex. It doesn't make sense that she would forget that she consented to sex, but that she remembers that she had sex, but she forgot that she consented to it. But let me ask you this. Thank you, but when a state court judge reviews a thousand documents to decide what ought to be turned over for Brady purposes, isn't the court's obligation to turn over everything that would be Brady material, or to turn over a representative sampling that would touch the base of every issue exposed by a full review of the documents? The court's obligation is to turn over material that the failure to disclose would create a reasonable probability that would affect the outcome of the trial. But how does the judge know that before the trial? Well, in this case, the court did have the defendant's grand jury testimony. So the court did have a sense of how the petitioner might try to litigate the case. And according to the extent that his grand jury testimony was consistent with what he said at trial, his defense was this woman had consensual sex with him and then fought over payment. And there's nothing in the victim's mental health records that suggested that she would do something like that, or that she would fabricate a false allegation of rape as retaliation for to get money in exchange for sex. Is there a document that suggests that she had run away with somebody's clothing or shoes on a cold day? Not to my knowledge. I'm not saying there is. I seem to recall it. Okay. But not to my knowledge. Your Honor, the one piece of material that did give the Court of Alleged Attempted Rape by her father. In that case, the court did stop short of stating that the evidence was inadmissible under the rape shield law, as that decision is a matter of the trial court's discretion. But it did make clear that that evidence faced multiple evidentiary hurdles that were likely to be insurmounted. And the appellate division also concluded that evidence likely would have been excluded under the state's rape shield law. Wouldn't it make sense to somehow involve the defense in those choices and in those arguments? Not necessarily, Your Honor. The same trial court that made the decision to withhold it would have been the same trial court to determine whether this would have been admissible at trial. So that's sort of like collapsing the trial in a very efficient way. But it kind of leaves out a role for the defense. Well, it would be for the trial court to determine in the first instance whether this could be something that could affect the outcome of the trial, because it may or may not be admissible. And if the court determines that it wouldn't be admissible because the falsity of the allegation could not be established, and because as the Court of Appeals and the appellate division recognized, the differences in the two accounts were so vast that it could not, that the allegation, even if false against the father, doesn't inform the jury about the veracity of the allegations made here. But that's a little bit peculiar, isn't it? I mean, the appellate courts in New York said, this is a case where one side or the other is lying. And that was of some significance, I think, because there were, well, at least it became of significance to the district court, because the district court uncovered a document that spoke of confabulation. I think that was, am I right, that was something the district court found? Yes, there was a single note that described confabulation. But again, as district court recognized, confabulation refers to filling in the blanks of a... Well, confabulation literally means putting stories together and confusing things. It seemed to me that it's not, the defense theory didn't have to be that she was deliberately making things up. The defense theory, certainly with a history of confabulation in mind, could have been that the defendant is, the victim, I'm sorry, was prone to delusions or to confusing things that happened with things that didn't happen. It's not at all clear to me that the only viable defense here had to be she made it up, as opposed to maybe she thought it did happen, given that there is this history of possibly having flashbacks to unpleasant things after you experience something unpleasant and so on. It's a more complicated story, I think, than just one person is telling the truth and the other one must be lying, isn't it? Not necessarily, your honor. Petitioner was trying to get across that the victim said what she said to get back at him for not paying for sex. That she, that after consensual sex occurred, they fought because she's trying to extract money from him. And having failed to do that, she goes outside and completely changes demeanor from being silent and cold to, from what other witnesses say, crying and screaming and yelling that she had been raped. The only conclusion the jury can reach, well anyone can really reach about that, is that she, she was lying about. Well, that's his, that's his theory of what's going on in her mind. He's not, he's not a psychiatrist and he's not privy to what's actually going on in her mind. He only knows if his story of what happened is true, what she did. And he's creating his own theory of what happened. I don't know that counsel for him is bound to say that's, that's what you the jury have to believe or that's the only reasonable doubt you can have, particularly if counsel had access to psychiatric records that might suggest a better theory of why her account is inconsistent in the defense version with what actually happened. So I'm just, I'm just puzzled over why the New York appellate courts would rule evidence out as unlikely to affect the case on a theory that the jury had this stark choice of, we either believe that she is intentionally lying, I mean obviously the, the jury has to conclude or at least have a, jury has to at least have a reasonable doubt about whether her story is accurate in order to acquit. But I don't think the jury has to a reasonable doubt about whether she is intentionally lying in order to acquit. Am I wrong about that? You're not wrong about that, your honor. But given that this was an immediate outcry and given that she gave detailed accounts about what happened to her. Can I interrupt Ms. Stewart? Isn't it also the fact that immediately after the event, when police talked to Mr. McCrae, he denied knowing anyone by the victim's name and said he didn't recognize the photograph of one of the locations where he later said they went. Yes, he did. He, he, he lied repeatedly, specifically about the fact of this case. He lied to the police. He even lied to his best friend when he went to his house immediately after, after he left his jacket behind, he went immediately to his friend's house, banged on the door, demanding entry and said that the victim, that the victim had been chasing him. And we know that's not true because she was off calling the police and getting help. She, he ran away. That's part of the constellation of facts that the Court of Appeals was considering when deciding whether this was material or not. Yes, it is, your honor. And your honor, I just want to make one other point that was brought up on my opponent's argument. The fact that the, that the state court may or may not have discussed a particular document is not necessarily indicative that they did or did not read it. So if there are documents that the court has reviewed that were not discussed in the other decisions, that doesn't mean that the court hadn't considered it. Given that all these documents were presented to the court in camera, there should be a presumption that the court reviewed them in making its determination. Well, thank you very much. We'll, we'll now hear from Mr. Edelstein for three minutes of rebuttal. Your honor, to, your honor, to briefly address a couple of the points counsel made. This is not a case where one or the other person had to have been deliberately lying. The conditions that the complainant had been diagnosed with included confabulation, which is your honor points out means, and as the people, I mean, in fact, the respondents stated in their brief means putting together fantasies, putting together false memories that, and it may have been a situation where as the Court of Appeals surmised with the incident with her father, that she thought she was being raped and the, her behavior afterwards would be consistent with someone who thought she was being raped. In addition to being consistent with someone who actually was someone who thought that she had just been raped might make an immediate outcry, but might be wrong in that outcry. And there were also, as the appellate pointed out, there were some other flaws in the complainant's testimony, such as discrepancies in the length of time that the various parts of the incident lasted and testimony about a struggle that was far, you know, in her, as she related it was, while not incredible as a matter of law was inconsistent with her minor injuries. So this is not a case where someone had to be lying. And it's not a case where it was the jury would definitely find that that person was the defendant. I mean, there's certainly other reasons why the defendant might have said what he said, either fear, nervousness, you know, as anyone would, would experience who would just been in struggle, whether that struggle was sexual or not, showed a photograph of a house, you know, Mr. McRae sees hundreds of houses every day, you know, he, he might not recognize the outside of that one on a moment's notice. This is not a case where a jury had would necessarily have decided even in would necessarily have convicted Mr. McRae even with this evidence. In fact, the appellate division said this was a case where acquittal would not have been unreasonable. In terms of the incident regarding her father, the trial court never made a decision about whether that was admissible, and neither did the state appellate courts. And certainly, as the dissent pointed out, there are some significant commonalities between that incident in this one, starting with the fact that she described her father pushing her against the wall in a sexual position, which is exactly how she claimed this incident started. So there is a reasonable probability. I mean, again, we're going back to reasonable probability, this would have been admissible, especially in light of the confabulation, especially in light of her admission that she lied on other occasions. And then especially in light of the further evidence that she just did not have a steady grip on reality, which was interesting. Mr. Osteen, the hard thing for you about this case is the standard of review, isn't it? I mean, as you just said, you argue that there is we should conclude there is a reasonable possibility that the case would have been turned over. But isn't it the case that what we have to decide is not whether we would have voted with Judge Rivera in dissent in the Court of Appeals, but whether the majority opinion there unreasonably concluded that there was not a reasonable probability that additional material would have affected the outcome. But that is an unreasonable thing to think. Isn't that what we would have to decide in order to grant habeas? Yes, Your Honor, I agree. That's what would that's what this court would have to decide. And that's what this court did decide in the very similar case of Fuentes, which was decided under the AEDPA. And where I mean, there were a few differences between Fuentes in this case. Fuentes, the defendant didn't get any psych records at all. Here he got 0.5 of 1% of the psych records and none of the ones that actually mattered. So I would submit functionally this is a situation very similar to Fuentes. And in fact, in Fuentes, the withheld records involved mood disorders, whereas here the records directly involved the complainants' truthfulness and ability to perceive, recall, and recount. So I would submit that this is even more compelling case than Fuentes. And I would also submit going back to Supreme Court precedent, that this is the state courts unreasonably applied various progeny of Brady, including Aggers and Weary, which had very pointed things to say about how in close cases, even evidence that a court might believe is minor, even evidence that impeaches further a witness that had already been impeached in other ways, meets the Brady standard. And I would submit that it was unreasonable for the courts, the state courts, not to pay heed to that. Well, I would submit that I'm out of time. Well, thank you both very much. Very well argued. We will reserve decision and move to the next